IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Beverly J. Casselman, )
 ) Civil Action No. 6:05-2905-JFA-WMC
   Plaintiff, )
 ) **REPORT OF MAGISTRATE JUDGE**
 vs. )
 )
Jo Anne B. Barnhart, )
Commissioner of Social Security, )
 )
   Defendant. )
_____)

   This case is before the court for a report and recommendation pursuant to

Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this

District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

   The plaintiff brought this action pursuant to Sections 205(g) and 1383(c)(3)

of the Social Security Act, as amended, 42 U.S.C. Sections 405(g) and 1631(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security Administration that

the plaintiff was not entitled to disability insurance benefits ("DIB") or supplemental security

income benefits ("SSI").

## ADMINISTRATIVE PROCEEDINGS

   On September 3, 2002, the plaintiff filed applications for DIB and SSI alleging

disability beginning November 30, 2000.  The applications were denied initially and on

reconsideration.  On October 10, 2003, the plaintiff requested a hearing, which was held

on July 23, 2004. Following the hearing, at which the plaintiff, her attorney and a vocational

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

expert appeared, the administrative law judge considered the case *de novo*, and on October 27, 2004, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on August 10, 2005.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

(1)    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

(2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)    The claimant's diabetes, left-sided sciatica and back pain and numbness in her left lower extremity status-post fusion and internal fixation due to scoliosis and status-post back injury secondary to motor vehicle accident are considered "severe" impairments in combination based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

(4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)    The undersigned finds the claimant's allegations regarding her limitations are not fully credible for the reasons set forth in the body of the decision.

(6)    The claimant has the residual functional capacity to perform sedentary work as set forth above. She would be further limited to unskilled work with a sit/stand option.

(7)    The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

(8)    The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

(9)    The claimant has a "high school education" (20 CFR §§ 404.1564 and 416.964).

(10)    Transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

(11)    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

(12)    Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, and based on the testimony of the vocational expert, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a bench assembler (This is sedentary, unskilled work with 800,000 jobs existing in the national economy); a surveillance system monitor (This is sedentary, unskilled work with 104,000 jobs existing in the national economy); or a charge account clerk (This is sedentary, unskilled work with 30,000 jobs existing in the national economy).

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of

3

five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the

Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v.*
*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th
Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is "substantial
> evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to
assure that there is a sound foundation for the Commissioner's findings, and that her
conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there
is substantial evidence to support the decision of the Commissioner, that decision must be
affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The record reveals the plaintiff was 35 years old at the time she alleges she
became disabled due to back problems and diabetes, and 38 years old on the date of the
ALJ's decision (Tr. 65). She has a high-school education and has worked as a sewing-
machine operator (Tr. 85).

On November 22, 2000, the plaintiff was seen in the Emergency Department
of Georgetown Memorial Hospital following a motor vehicle accident. Her primary complaint
was lower back pain without weakness, numbness, or tingling in the extremities. She
denied any loss of consciousness, neck pain, chest pain, abdominal pain, and shortness
of breath. Examination revealed no edema, excellent proprioception, intact sensory
functioning, tenderness at the lumbosacral interspace, and tenderness in the paraspinal
muscles. X-rays revealed a normal pelvis, normal cervical spine, a Harrington rod overlying
the lumbar spine, no definite fractures, and 15-20% retrospondylolisthesis of L5 on S1. Dr.

5

Joseph J. Gammel rendered a diagnosis of "back strain status post motor vehicle crash" (Tr. 173-77).

On November 27, 2000, Dr. Julian L. Mason examined the plaintiff, who related a history of scoliosis with rod placement and complained of "some back pain." She denied numbness and tingling. Dr. Mason diagnosed "back strain" and prescribed Motrin and Flexeril (Tr. 182).

On December 4, 2000, the plaintiff complained to Dr. Mason of continuing pain in the lower lumbar region. She also complained that her right hip occasionally "[gave] way." Dr. Mason continued the plaintiff's medications (Tr. 181).

On December 11, 2000, December 27, 2000, and January 22, 2001, Dr. Mason prescribed Prednisone for the plaintiff for back pain (Tr. 178-80).

On February 7, 2001, Dr. Gregory Jones examined the plaintiff at Charleston Spine and Physical Medicine. The plaintiff complained of pain in the lower back, right leg, and neck and said she had been unable to work since her motor vehicle accident. Dr. Jones found the plaintiff had no motor or sensory deficits, intact reflexes, negative straight leg raising tests, tenderness over the hips and lumbosacral spine, and tenderness over the subacromial and acromioclavicular joints and upper cervical spine. X-rays of the cervical and lumbosacral spine showed no acute changes. Dr. Jones diagnosed persistent low back pain with probable subacute lumbar facet syndrome/sprain syndrome and apparently stable Harrington rod placement; cervicothoracic myofascial and facet-generated pain; and "right leg and foot cramping pain." He prescribed Motrin, Percocet, and physical therapy, and restricted the plaintiff from working until further notice (Tr. 257-58).

On March 9, 2001, the plaintiff reported a 10-20% improvement in her symptoms to Dr. Jones. Dr. Jones noted that the plaintiff's physical therapist had reported significant weakness in the lower back and lower extremities. He noted that weakness in the lower back would be expected, given the plaintiff's spinal hardware, but that the

6

weakness in her right leg possibly represented lumbar disc pathology. Dr. Jones administered lumbar facet block injections (Tr. 255).

On March 19, 2001, Dr. Jones performed electromyographic studies on the plaintiff's right lower extremity, the results of which showed no evidence of lumbar radiculopathy, lumbosacral plexopathy, or peripheral neuropathy. On the same date, the plaintiff reported a 50% improvement in her symptoms following the March 9, 2001, facet block injections (Tr. 252-53).

On April 20, 2001, the plaintiff advised Dr. Jones that she had experienced approximately "25-30% relief long term" from her facet block injections. With the exception of tenderness in the lumbosacral and greater trochanteric bursal regions, Dr. Jones' examination of the plaintiff revealed no abnormalities. Dr. Jones administered injections and recommended an MRI scan (Tr. 251).

On May 9, 2001, Dr. Jones noted that the plaintiff had obtained further benefit (25% relief) from the injections administered on April 20, 2001, and that most of the symptoms in her cervical region had resolved. He found that the plaintiff's MRI scan showed a disc protrusion and shallow herniation with potential for compromise of the right L5 nerve root and the S1 nerve roots, and a possible right adnexal mass. Dr. Jones stated that the plaintiff should remain off work due to "low back and leg symptomatology" (Tr. 247).

On May 10, 2001, and June 21, 2001, Dr. Jones administered epidural and nerve root blocks to the plaintiff (Tr. 235-46).

On July 19, 2001, Dr. Donald R. Johnson, II, performed an independent medical evaluation of the plaintiff at the request of her attorney. The plaintiff related a history of some chronic back pain following surgical placement of a Harrington rod at age 13. She stated that she had had worse back pain as well as pain in the leg and buttock since her motor vehicle accident and that she had been unable to return to work since that time. Dr. Johnson found the plaintiff had positive straight leg raising tests; tenderness over

7

the right sciatic notch, right sacroiliac joint, and paralumbar musculature; good plantar flexion, dorsi flexion, knee flexion/extension, and hip extension; and limited range of motion, appropriate for her instrumented fusion.  Dr. Johnson reported diagnoses of status post thoracal lumbar fusion with instrumentation for scoliosis; chronic low back pain; and right-sided lumbar radiculopathy with disc herniation at L5-S1.  He advised against surgical intervention due to her instrumented fusion (Tr. 266-67).

On August 10, 2001, Dr. Jones noted that the plaintiff had had an "excellent response" to the epidural and selective blocks administered in May and June 2001, that she had reached maximum medical improvement, and that she had a 5% whole person impairment based on her lumbosacral spine impairment.  Dr. Jones also released the plaintiff to return to work without restrictions (Tr. 234).

On October 11, 2001, Glucovance was prescribed for the plaintiff at St. James for treatment of type II diabetes mellitus (Tr. 146).

On April 17, 2002, the plaintiff underwent a vaginal hysterectomy for treatment of pelvic prolapse at Georgetown Medical Center.  She was discharged on April 19, 2002 (Tr. 268-75).

On August 27, 2002, the plaintiff presented at St. James with complaints of a two-week history of worsening lower back pain.  A diagnosis of musculoskeletal pain was noted, and Relafen was prescribed.  The plaintiff's diabetes mellitus was noted to be under "excellent control" (Tr. 141).

On August 30, 2002, the plaintiff returned to Dr. Jones complaining of pain in the lower back and left buttock.  Dr. Jones noted the plaintiff had returned to work in August 2001, but had stopped working after one month due to back pain.  Examination revealed tenderness over the left lumbosacral region and left sciatic notch.  Dr. Jones administered injections, prescribed Relafen and Darvocet, and stated that the plaintiff had the following permanent work-related restrictions:  no lifting or pushing/pulling more than

8

25-30 pounds on a frequent or repetitive basis; no frequent or repetitive bending, stooping, or crawling; no standing/walking or sitting for more than one-to-two hours at one time; no "high altitude or ladder work or climbing activities without railing/support"; and a need for frequent positional changes (Tr. 231).

On September 18, 2002, the plaintiff advised Dr. Jones that she had not had long-lasting relief from her recent facet blocks and that her symptoms had worsened and included cramping and numbness in the left leg. Dr. Jones noted an impression of left sciatica and administered epidural nerve blocks (Tr. 224, 230).

On October 23, 2003, Dr. Anne Allen examined the plaintiff at Charleston Spine and Physical Medicine. Dr. Allen found the plaintiff had decreased range of motion in the lumbar spine, a positive seated-flexion test, a slight leg-length discrepancy, obvious weakness in the left leg and buttock, decreased proprioception on the left, decreased strength in the toe extensor muscles on the left, and tenderness over the sacroiliac joint on the left. Dr. Allen noted an impression of progressive left sciatica "with L5 on S1 retrolisthesis of bilateral L5 spondylolysis;" left-leg weakness consistent with radiculopathy; and probably L4-5 and L5-S1 facet pain. Dr. Allen prescribed physical therapy and ordered diagnostic studies (Tr. 223).

On October 23, 2002, Dr. George T. Keller, III, assessed the plaintiff's residual functional capacity at the request of the Commissioner, based on a review of the plaintiff's records. Dr. Keller reported that the plaintiff could perform light work[2] with certain postural limitations (Tr. 276-83).

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

On October 29, 2002, the plaintiff underwent EMG studies on the lower left extremity that showed no evidence of lumbar radiculopathy or compressive neuropathy, but did reveal abnormalities in the tibial and sural nerves consistent with possible diabetic peripheral neuropathy (Tr. 221).

On November 8, 2002, the plaintiff underwent an MRI scan of the lumbar spine that showed scoliosis of the spine; a low-lying conus medullaris; degenerative disc disease at L5-S1; and mild retrolisthesis of L5 relative to S1 (Tr. 219-20).

On November 12, 2002, the plaintiff complained to Dr. Allen of continuing pain in the low back and left leg and weakness in the left leg. The plaintiff rated the intensity of her pain as "2" on a 1-to-10 scale while sitting, "5" while walking, and "9" when lying down. Dr. Allen found the plaintiff had normal reflexes in the knees and ankles; reduced range of motion of the lumbar spine; motor weakness in the quadriceps, extensor hallucis longus, peroneal, gluteus, and hamstring muscles, particularly on the left; decreased proprioception on the left; tenderness over the sacroiliac joint; and a positive seated flexion test. Dr. Allen prescribed Flexeril, continued the plaintiff's prescriptions for Darvocet, Relafen, and physical therapy, and recommended a series of nerve blocks (Tr. 218).

On November 26, 2003, Dr. Jones administered epidural steroid and nerve block injections to the plaintiff (Tr. 212-17).

On December 3, 2002, the plaintiff reported significant improvement to Dr. Allen following her injections and estimated the intensity of her pain as a "3" on a 1-to-10 scale. The plaintiff also reported improved strength with physical therapy (Tr. 210).

On January 23, 2003, the plaintiff's diagnoses were noted at St. James as consisting of diabetes mellitus ("well controlled") and "[musculoskeletal] pain/chest wall [pain]" (Tr. 140).

On January 29, 2003, Abraham P. Millan, a physical therapist, reported that the plaintiff had reduced strength in the muscles of the lower extremities, as follows:  left

10

hip flexion, 3/5; right hip flexion, 2+/5; left knee flexion, 4/5; right knee flexion, 3/5; and right knee flexion, 4+/5 (Tr. 209). Mr. Millan also reported that the plaintiff complained of back pain mostly at night and stated that her right foot and leg "[went] dead" after 5-10 minutes of walking (Tr. 209).

On January 29, 2003, the plaintiff complained of continuing pain in the low back and left buttock to Dr. Jones and rated the severity of her pain as 2-3/10 generally, and as 8/10 with activity or flaring. She also reported improvement in her strength with physical therapy. Dr. Jones noted that the plaintiff was "quite stable" and had shown improvement in strength and sensory disturbances over the past several months (Tr. 208). Dr. Jones also noted that the plaintiff was adamant about avoiding further surgery and scheduled another series of epidural and facet blocks (Tr. 208).

On March 20, 2003, Dr. Jones administered epidural steroid injections to the plaintiff (Tr. 202-07).

On April 9, 2003, Dr. Jones noted that the plaintiff had had almost complete relief from her March 20 injections for approximately three weeks, but that her pain in the left buttock and lower back had since returned, especially at night. The plaintiff also complained of muscle spasm in the left buttock and back, "especially with long standing and walking." Dr. Jones noted that the plaintiff was unable to tolerate a trial of OxyContin for more severe pain due to side effects. He also noted that the plaintiff was caring for her terminally ill husband, which was quite stressful, and was having difficulty with many activities, including helping with her husband's activities of daily living. Dr. Jones administered lumbar facet blocks and a sacroiliac joint block (Tr. 201).

On May 28, 2003, the plaintiff reported no significant benefit from her April 9 injections and complained of significant low back and buttock pain and numbness in the left leg, especially at night and when standing for long periods. The plaintiff rated the severity

11

of her pain as 4/10 on the average, and as 6-10/10 at night.  Dr. Jones prescribed Ambien and continued her other prescriptions (Tr. 196).

On May 29, 2003, and July 18, 2003, Dr. Jones administered epidural steroid injections and spinal nerve blocks to the plaintiff (Tr. 183-94).

On May 6, 2003, the plaintiff's diagnoses were noted at St. James as consisting of moniliasis[3] and diabetes mellitus (Tr. 139).

On June 30, 2003, Dr. F. Keels Baker assessed the plaintiff's residual functional capacity at the request of the Commissioner, based on a review of the plaintiff's records.  Dr. Baker concluded that the plaintiff could perform sedentary work with certain postural limitations (Tr. 288-95).

On August 28, 2003, the plaintiff presented at St. James with complaints of a two-week history of back pain.  The plaintiff also reported that she had scoliosis and that she was caring for her terminally ill husband.  Relafen, Darvocet, and Glucovance were prescribed (Tr. 138).

On September 18, 2003, Dr. William Cain assessed the plaintiff's residual functional capacity at the request of the Commissioner, based on a review of the plaintiff's records.  Dr. Cane reported that the plaintiff could perform sedentary work, subject to certain postural limitations (Tr. 300-07).

On March 4, 2004, Neurontin was prescribed for the plaintiff at St. James for lower back pain.  Her diabetes mellitus was noted to be under excellent control (Tr. 137).

On March 20, 2004, the plaintiff complained of persistent back pain at St. James and was referred back to Dr. Jones (Tr. 137).

On April 8, 2004, the plaintiff was treated for sinus congestion at St. James. The plaintiff also complained of feeling stressed due to her husband's terminal cancer.  It

---

[3]Moniliasis, also known as candidiasis, is a fungal infection.  *Dorland's Illustrated Medical Dictionary* 1052 (28th ed. 1994).

was noted that the plaintiff's diabetes mellitus was under excellent control and that she would see Dr. Jones for treatment of degenerative joint disease (Tr. 136).

In May 2004, Paxil was prescribed for the plaintiff at St. James. In June 2004, Paxil and Celebrex were prescribed (Tr. 135).

On July 22, 2004, Dr. Jones completed a form entitled Listing 1.04 - Disorders of the Spine. Dr. Jones opined that the plaintiff suffered from a herniated nucleus pulposus, with decreased strength, L5 myotomal patter bilateral lower extremities, intermittent medications and/or physical therapy for mild to moderate flares, intermittent epidural/selective nerve root blocks, medications for more severe flares (no more than 3-4 nerve blocks in 12 months). He went on to state that the plaintiff had pain, history of muscle spasm, significant limitation of motion in the spine, appropriate radicular distribution of significant motor loss, which he explained as L5 weakness pattern consistent with MRI findings and known pathology, appropriate radicular distribution of muscle weakness, appropriate radicular distribution of sensory loss, and did not have appropriate radicular distribution of reflex loss. He further stated that these problems have persisted for at least three months despite prescribed therapy and have lasted or are expected to last at least 12 months. He concluded that the plaintiff's combined impairments are medically equivalent to the severity of conditions in Listing 1.04 (Tr. 322-23).

At the hearing on July 23, 2004, the plaintiff testified that she worked as a sewing machine operator until November 2000, when she suffered an injury to her back in a motor vehicle accident (Tr. 369). She testified that she tried to work in 2002 but stopped after one month due to back pain (Tr. 370-71). She stated that she was unable to perform her job because it involved prolonged sitting (Tr. 374). She also stated that sitting was her most comfortable position (Tr. 385). She testified that she had not considered attempting other kinds of work because she had trouble with spelling, had a learning disability, and was "not qualified for other stuff" (Tr. 374). She indicated she experienced severe pain in her

13

left leg and lower back after standing or sitting for 10 minutes, and numbness in her left leg after standing for 10 minutes (Tr. 371-73). She testified that a gallon of milk was the heaviest thing she could lift on a regular basis, that her left leg sometimes gave way, that she had poor balance due to a leg-length discrepancy, and that she experienced back pain with overhead reaching (Tr. 382-84). She testified that her husband was receiving Social Security disability benefits based on a back impairment and also had throat cancer (Tr. 367, 373). She testified that she was her husband's primary caretaker and that she did housework, including sweeping and dishwashing (Tr. 373, 376). She stated that she took oral medication for diabetes and that her blood sugar levels had been good (Tr. 375). She stated that she had not seen a physician for back pain in approximately one year due to financial problems (Tr. 376). She stated that she took Celebrex and Lortab for pain, that they helped "a lot" and that her pain was worst when lying down (Tr. 377-78). She also testified that she had problems with her memory, but that her memory had not affected her ability to care for her husband (Tr. 380).

James L. Burge, a vocational expert, testified at the hearing that the plaintiff's past job as a sewing machine operator was light, unskilled work that required sitting most of the time (Tr. 387). The ALJ asked Mr. Burge to consider a person of the plaintiff's age and education who was limited to unskilled sedentary work; who could not lift more than 10 pounds; who could not crawl, crouch, climb, squat, or kneel; who could not use her legs or feet to operate controls; and who needed to alternate between sitting and standing while working (Tr. 387-88). Mr. Burge testified that such an individual could work as a cuff folder, trimmer, dowel inspector, surveillance system monitor, charge account clerk, and order clerk (Tr. 388-89). He testified that if such a person had to alternate between sitting and standing every 10 minutes she could still perform those jobs (Tr. 390). Mr. Burge also testified that a person who had difficulty with spelling could not work as a charge account clerk or order clerk (Tr. 390).

## ANALYSIS

The ALJ found that the plaintiff could perform sedentary work that was unskilled with a sit/stand option.  The plaintiff alleges that the ALJ erred by (1) failing to give Dr. Jones' opinion controlling weight; and (2) failing to properly evaluate her credibility.

### Treating Physician

The plaintiff first argues that the ALJ improperly failed to give Dr. Jones' opinion controlling weight.   In a form dated July 22, 2004, Dr. Jones opined that the plaintiff's combined impairments were medically equivalent to the severity of conditions in Listing 1.04[4] (Tr. 322-23).  The ALJ gave Dr. Jones' opinion "less than controlling weight" as there was "little evidence to support this opinion."  Specifically, the ALJ noted that there were no records showing Dr. Jones treated the plaintiff between June 2003 and July 2004.  Further, in treatment notes dated January 2003, Dr. Jones stated that the plaintiff's condition was "quite stable, in fact she has shown some improvement in strength and sensory disturbances over past several months or more."  Accordingly, the ALJ concluded that Dr. Jones had "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant," whom the ALJ found to be not fully credible.  The ALJ also stated that it was "possible" that Dr. Jones expressed his opinion out of sympathy for the plaintiff or because the plaintiff was insistent in seeking a supportive note from him.   The ALJ

---

[4]Listing 1.04 of the Listing of Impairments states in pertinent part:

> 1.04 Disorders of the Spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine) . . . .

15

concluded that this possibility was "more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case" (Tr. 23).

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still

16

> entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

This court finds that the ALJ erred in failing to give controlling weight to Dr. Jones' opinion. Dr. Jones is a specialist in the field of orthopedics who treated the plaintiff for over three years. Dr. Jones, along with his associate Dr. Anne Allen, treated the plaintiff over 22 times and ordered laboratory work and diagnostic tests, including MRIs and an EMG. In May 2001, Dr. Jones found that the plaintiff's recent MRI scan showed a disc protrusion and shallow herniation with potential for compromise of the right L5 nerve root and the S1 nerve roots, and a possible right adnexal mass. Dr. Jones stated that the plaintiff should remain off work due to "low back and leg symptomatology" (Tr. 247). On November 8, 2002, the plaintiff underwent another MRI scan of the lumbar spine that showed scoliosis of the spine, a low-lying conus medullaris, degenerative disc disease at L5-S1, and mild retrolisthesis of L5 relative to S1 (Tr. 219-20). The plaintiff underwent multiple injections or nerve blocks, two courses of physical therapy, and multiple pain medications.

In January 2003, Dr. Jones noted:

> Although Dr. Allen was concerned about the motion at L5-S1, this is a very much chronic condition, and this is primary reason for patient's continuation problems with radicular pain in spite of non-surgical measures including bloc procedures. This is a fixed bony lesion, this tends to not only compromise the exiting L5 nerve roots passing through L5-S1 neural foramen bilaterally, but also would tend to compromise/compress the transiting S1 nerve roots bilaterally.

(Tr. 208).

In an examination in April 2003, Dr. Jones noted that the plaintiff had significant tenderness over the left L5-S1 facet, and moderate tenderness over the left L4-5

17

level, and marked tenderness over the left SI joint at the superior aspect of the joint.  His

impression was

> 1. complex multifactorial low back pain with probably symptomatic degenerative L5-S1 protrusion with bilateral neuroforaminal and canal compromise of existing L5 nerve roots and transiting S1 nerve roots, symptoms current worse on left with intermittent flares of left greater than right sciatica. 2. L5 on S1 retrolisthesis, 1-2 mm motion noted on flexion/ extension views lumbar spine, spinal construct (Harrington rod) stable otherwise, with no hardware breakage noted on most recent plain radiographs. 3. Multilevel lumbar facet arthropathy, most problematic/symptomatic lower lumbar levels bilaterally, with sacroilitis and hip bursitis as well as leg length discrepancy all contributing to secondary pain phenomenon. Left L5-S1 lumbar facet blocks and left S1 joint block.

(Tr. 201).  In May 2003, Dr. Jones performed a left S1 transforaminal epidural steroid

injection and left L5-S1 translaminar epidural steroid injection.  He noted that the injections

were an attempt to get recent flaring under better control non-surgically (Tr. 190).  In July

2003, he performed another epidural steroid injection (Tr. 183).  While the plaintiff did not

see Dr. Jones for a period from June 2003 to July 2004, she continued to seek medical

treatment for her back pain at the St. James - Santee Clinic (Tr. 136-38).

As argued by the plaintiff, Dr. Jones' opinion includes explanation of his

findings based upon objective medical evidence, not purely the subjective complaints

relayed to him by the plaintiff.  Furthermore, his findings do not appear to be inconsistent

with the other credible evidence in the record, including the evaluation of independent

medical examiner Dr. Johnson (Tr. 266-67).  Accordingly, the ALJ erred in failing to give the

opinion controlling weight.

### Subjective Complaints

The plaintiff next argues that the ALJ failed to conduct a proper credibility

analysis.  A claimant's symptoms, including pain, are considered to diminish his capacity

to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence.    20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility."  *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

19

The ALJ found as follows with regard to the plaintiff's credibility:

> The undersigned finds that the claimant's testimony is not fully credible concerning the severity of [her] symptoms and the extent of [her] limitations.  Neither the severity nor the extent is supported by the objective medical evidence of record.
>
> The claimant has described daily activities, including performing all of the housework, which is not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.
>
> The doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were actually disabled.  Specifically, multiple examinations revealed negative straight leg raising and only tenderness of the claimant's spinal musculature and sciatic notches.  She was able to move off of the table.  While x-rays and MRIs revealed evidence of degenerative disc disease, there was no evidence of spondylosis or significant stenosis . . .
>
> The undersigned finds that the claimant's complaints at hearing were significantly more severe than those described to her physicians which implies that the claimant may have exaggerated her symptoms at her hearing.

(Tr. 22).  The ALJ further stated that the various forms of treatment the plaintiff received had been "generally successful in controlling [her] symptoms" (Tr. 23).  He also noted that she had significant gaps in her medical treatment and that the plaintiff had worked after the alleged onset date (Tr. 23).

The ALJ's finding as to the plaintiff's credibility is not supported by substantial evidence.  As argued by the plaintiff, her complaints are supported by Dr. Jones' extensive treatment notes and opinion discussed above.  While the ALJ found that the plaintiff "may have exaggerated her symptoms at her hearing," the record shows that the plaintiff complained of severe problems to her physicians many times.  Further, there does not appear to be in the record any reflection of exaggeration or malingering with any of the plaintiff's treating physicians.  The injections and blocks administered by the plaintiff's

20

doctors did have temporary benefit for the plaintiff; however, the record shows the continued recurrence of these symptoms. The record further shows that the benefit of the injections and blocks decreased over time (Tr. 196, 208). The plaintiff worked after her alleged onset date, which the ALJ felt indicated that her daily activities at times have been somewhat greater than what she "generally reported" (Tr. 23). At the hearing, the plaintiff explained that in 2002 she attempted to go back to her job as a sewing machine operator. However, because of her low back pain, the plaintiff was only able to work "maybe a month" (Tr. 370-71). This work attempt shows the plaintiff's willingness to try to return to work. Lastly, the ALJ found that the plaintiff's performance of housework showed that she was not limited to the extent one would expect (Tr. 22). However, the ALJ failed to note that the plaintiff testified that she could sweep for only a few minutes because of the pain (Tr. 381). Further, the only other persons in her home were her son, who she said helped with the chores, and her husband, who at the time of the hearing was dying of throat cancer (Tr. 373, 376, 380-81).

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits. Reopening the record for more evidence would serve no purpose. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974). Accordingly, this court recommends that the Commissioner's decision be reversed and that the case be remanded to the Commissioner to take appropriate action for the awarding of benefits.

s/William M. Catoe
United States Magistrate Judge

August 17, 2006

Greenville, South Carolina

21